**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 21-CR-310-2 (ABJ)** |
| | : | |
| **ISRAEL TUTROW,** | : | |
| | : | |
| *Defendant.* | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Israel Tutrow to 60 days of incarceration and $500 in restitution.

I.      <u>**Introduction**</u>

Tutrow participated in the January 6, 2021, attack on the United States Capitol – a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured over 100 law-enforcement officers, and resulted in over $1.4 million of property damage.

Tutrow stands before this Court to be sentenced on a misdemeanor conviction, but his conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed.

The government is requesting a 60-day term of incarceration based on an assessment of relevant sentencing factors. Tutrow, who has a significant criminal history, traveled from Indiana

and unlawfully entered the Capitol with his friend and codefendant Joshua Wagner.  Wagner recorded videos on his cellphone that captured Tutrow walking to the Capitol.  Tutrow told the Federal Bureau of Investigation ("FBI") that he heard someone outside the Capitol admit he "wrestled a cop."  He also admitted seeing officers engaging rioters and deploying tear gas on one side of the Capitol, so he went around and entered on the other side of the building.  By Tutrow's account, he remained inside the building for about 30 minutes, and Wagner captured him on video inside the Capitol Crypt.

Tutrow and Wagner became separated inside the Capitol at some point, and after they reunited outside, Tutrow admitted to Wagner he had brought a knife into the building.  When Tutrow was later asked by the FBI whether he brought a weapon into the Capitol, he falsely stated three times that he did not.  He also made material statements about Wagner's conduct that he recanted.  He also incredibly claimed that he "didn't know [he] was trespassing" when he entered the building.

To his credit, Tutrow turned himself in to the FBI when he was notified there was an arrest warrant for him, gave a voluntary post-arrest interview with the FBI, albeit flawed, and promptly accepted responsibility after the government tendered a plea offer.

## II.  <u>Factual and Procedural Background</u>

*The January 6, 2021, Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the Capitol in ECF No. 37 at 1-3.  As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent—contributed, directly and indirectly, to the violence and destruction of that day.

*Tutrow's Role in the January 6, 2021, Attack on the Capitol*

Tutrow traveled by car from Indiana with his friend Wagner and another individual to attend the rally President Donald Trump planned to hold in Washington, D.C., on January 6, 2021. With Wagner driving, they left Indiana on January 5, stayed overnight in a hotel outside of Washington, and arrived in Washington on January 6. After arriving for the rally, Tutrow, Wagner, and the other individual made their way to the Capitol.

As Tutrow walked to the Capitol with Wagner and the other individual, Wagner recorded videos on his cellphone that capture his first-person perspective. Wagner primarily walked behind Tutrow as he recorded these videos, which depict Tutrow wearing a black hooded sweatshirt, a camouflage vest, and a black knit hat with "TRUMP" embroidered on the front of it, as depicted below:



Eventually, Tutrow and Wagner unlawfully entered the Capitol.  One of Wagner's videos captured Tutrow, wearing the black hooded sweatshirt and camouflage vest, inside the Capitol in the area known as the Crypt.  At some point, Tutrow and Wagner got separated inside the building.

Other video evidence from another source also depicted Tutrow exiting the Memorial Doors at the Capitol's East Front, wearing the black knit hat, and distinguished by his facial tattoos, as depicted below:



Tutrow and Wagner reunited outside the building.  In another video Wagner recorded, Tutrow stated in a concerned tone, "Dude, I had my knife on me.  I'm not—I'm not gonna get in trouble, am I?"[1]  Wagner advised him not to get "grappled," and opined, "I don't think no one's really getting arrested – they're just pushing back.  They can't detain people because there's not enough cops to secure a perimeter."

Following the issuance of an arrest warrant, Tutrow turned himself in to the FBI in Indiana on January 27, 2021.

---

[1] Tutrow contends, through comments his counsel sent to the presentence-report writer, that he "found the small pocket knife in an inside jacket pocket—did not know it was there when he entered the capitol—unintentional."

4

*Tutrow's Post-arrest Interview with the FBI*

On January 27, 2021, Tutrow gave a voluntary post-arrest interview to the FBI.  During the interview, he admitted traveling to Washington with Wagner and another individual because he believed he had an opportunity to "watch history" by attending the rally on January 6, 2021.

When Tutrow "was walking up" to the Capitol, "everyone was starting to climb the thing, but they didn't look like they were doing anything bad."  However, he heard "this one kid said he wrestled a cop, and I didn't really think much of it."  He also admitted seeing officers engaging rioters and deploying tear gas on one side of the Capitol, so he went around and entered on the other side of the building.

Tutrow claimed that shortly before he decided to enter the Capitol, other individuals said, "C'mon, they're letting us in," and no one stopped him and Wagner from entering.  Tutrow "followed the crowd" inside, and claimed that at the time of his entry, "there really wasn't any destruction happening."  Once inside, he saw "people were starting to protest."  He heard people chanting "Stop the Steal."  Tutrow estimated he was inside the building for approximately 30 minutes and "just walked around" without engaging in violent or destructive conduct.  He claimed he did not see violence inside.

At some point, Wagner "disappeared," and Tutrow got separated from Wagner and the other individual who traveled with them.  Tutrow tried to find Wagner.  He did not know if that other individual entered the Capitol.

Tutrow admitted he was wearing a body-armor vest when he entered the Capitol, though he stated the vest did not have any armor plates in it.  When asked why he wore the vest that day, he replied, "I don't know.  It just looked cool."[2]

---

[2] The lead FBI agent assigned to the case opined, based on the images of Tutrow wearing the vest, it did not appear to have armor plates in it.

Tutrow stated that on the way home to Indiana, he told Wagner, "I didn't want to do this. I didn't want to be there at all. . . .  This isn't what I came here for."  Nevertheless, he told the FBI he "suspected something like this was probably going to occur."

During the course of the interview, Tutrow twice claimed he was "not . . . aware of" anyone in his group of three bringing weapons to Washington, and he specifically denied one additional time he had any weapons on him.  Despite these assertions, he was later caught on Wagner's video admitting he had brought a knife into the Capitol.  At another point in the interview, Tutrow smiled and claimed, "I didn't know I was trespassing" when he entered the Capitol.  But when an FBI agent questioned whether he had gone through magnetometers before he entered, he responded, "Yeah, I started to gather that.  And that's why I was kind of looking for Josh."   Multiple times, Tutrow made at least one other material characterization of Wagner's conduct that he later recanted during the interview.

Tutrow said he was worried after January 6 that he might be wanted by the FBI for "something that I didn't know I did wrong."  He said he deactivated his social-media accounts after January 6, but denied doing that because he feared the FBI would identify him.  The FBI did not uncover evidence that Tutrow engaged in social-media promotion of his or others' breach of the Capitol.

Tutrow knew at the time he entered the Capitol that he did not have permission to enter the building and he paraded, demonstrated, or picketed inside the building.

*The Charges and Plea Agreement*

On January 25, 2021, Tutrow was charged by Complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  On January 27, 2021, he was arrested after he turned himself in to the FBI.  On April 19, 2021, Tutrow was charged by an

Information with four counts that mirrored the violations listed in the Complaint.  On October 6, 2021, he pleaded guilty to Count Four of the Information, which charged a violation of 40 U.S.C. § 5104(e)(2)(G).  In his plea agreement, Tutrow agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Tutrow now faces sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G).  As noted by the plea agreement and the U.S. Probation Office, he faces up to six months of imprisonment and a fine of up to $5,000.  Tutrow must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559(a)(7); U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6).

#### A.  The Nature and Circumstances of the Offense

The attack on the Capitol on January 6, 2021, is a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants.  By its

very nature, the attack defies comparison to other events.  So too does the conviction Tutrow now faces.  Picketing, demonstrating, or parading at the Capitol as part of the riot on January 6 was not like picketing at the Capitol some other day, without other or with relatively few rioters present.

All defendants should be sentenced based on their individual conduct.  But this Court should note that each individual person who entered the Capitol on January 6 did so under the most extreme of circumstances, and Tutrow is no exception. As individuals entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob.  Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement and smelled chemical irritants in the air.

Even before he entered the building, Tutrow noticed people "starting to climb the thing" at the Capitol—although it is unclear what that "thing" was—and heard someone state he had "wrestled a cop."  He also admitted seeing officers engaging rioters and deploying tear gas on one side of the Capitol, so he went to another part of the building to enter.  While he initially told the FBI he did not know he had "trespassed," he backed away from that statement when an FBI agent confronted him about whether he had gone through a magnetometer when he entered.

While looking at a defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement;

and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive or dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment. Had the defendant personally engaged in violence or destruction, he or she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases.

While the FBI was not able to determine where Tutrow had entered the Capitol, Tutrow was captured on Wagner's video inside the Crypt. Tutrow admitted remaining inside the building for about 30 minutes before he exited the Memorial Doors.

While the government is unaware of evidence that Tutrow personally engaged in or encouraged violence or vandalism at the Capitol, he was captured in one of Wagner's videos admitting—and also admitted during his plea colloquy—he brought a knife inside the Capitol. In the video, Tutrow sounded concerned, and wondered aloud whether he would get in trouble for that. He contends, through counsel, that this was a "small pocket knife" and his possession of it inside the Capitol was "unintentional." The concerned tone of his voice may support that claim. But it may also reveal his realization of the consequences of his possession of a knife after he made the decision to unlawfully enter the building. Tutrow traveled several hours by car from Indiana, and stayed overnight in a hotel before going to the rally on January 6. At some point during his hotel stay, he presumably would have taken off his jacket, and realized there was knife in his pocket. At any rate, there was ample time for him to appreciate the knife was in his jacket before entering. Even assuming, for argument's sake, his possession of the knife was unintentional, it is still a highly aggravating factor because he denied carrying a weapon three times during his FBI interview.

Tutrow self-surrendered to the FBI after the warrant issued for his arrest, and he submitted to a post-arrest interview with the FBI, for which he deserves credit.  However, at multiple points during his interview, he was not truthful and minimized his conduct.  Most prominently, as noted above, he falsely denied three times that he brought a weapon to the Capitol.  In addition, he claimed, while smiling, he did not know he was trespassing.  Later in the interview, he again minimized his conduct by stating that after leaving Washington, he was worried he would face legal consequences for "something that I didn't know I did wrong."  Further troubling, he made material statements about Wagner's conduct that he later recanted after the FBI pressed him about them.

The FBI did not find evidence that Tutrow engaged in promotion of the Capitol riot on social media or elsewhere.  Soon after the government tendered him a plea offer, Tutrow, through his attorney, expressed a desire to take responsibility for his conduct and accepted the offer.  The government gives significant weight to his desire to resolve his case promptly.  However, Tutrow's aggravating conduct—especially his entry despite seeing evidence of a riot, bringing a weapon inside the Capitol and denying that to the FBI, minimization of his conduct, and making other misrepresentations to the FBI—weigh in favor of incarceration.

Accordingly, the nature and circumstances of the offense establish the need for a sentence of incarceration here.

### B.  The History and Characteristics of the Defendant

As set forth in the presentence report ("PSR"), Tutrow had a troubled upbringing, and has struggled with substance abuse and mental-health issues since he was a teenager.  PSR at 11-14. He has had difficulty maintaining employment.  *Id.* at 14-15.  He also has a significant criminal

history.  In addition to one other juvenile adjudication of guilt from 2015, *id.* at 6, Tutrow has the following criminal convictions:

| Disposition Date | State | Offense(s) | Sentence Imposed |
|---|---|---|---|
| 8/15/2017 | Indiana | 1. Possession of Controlled Substance<br>2. Possession of Marijuana | 1. 365 days of jail, all but 30 suspended, plus probation<br>2. 180 days of jail, all but 30 days suspended, plus probation<br><br>(Probation revoked on 7/27/2018; 79 days of jail imposed) |
| 3/19/2019 | Indiana | Contributing to Delinquency of Minor | 365 days of jail, all but 65 days suspended, plus probation |
| 3/19/2019 | Indiana | 1. Possession of Marijuana<br>2. Possession of Drug Paraphernalia | 30 days of jail, each count (concurrent) |
| 2/2/2019 | Indiana | Illegal Consumption of an Alcoholic Beverage | 90 days of jail |

According to the PSR, Tutrow would have seven criminal-history points and a criminal-history category of IV if the sentencing guidelines were applicable to his offense of conviction.  *Id.* at 6-10, 16.

According to the prosecutor who prosecuted the case involving contributing to the delinquency of a minor in Hancock County, Indiana, the circumstances of that matter were quite serious. As established during a jury trial, Tutrow, then 19 years old, provided alcohol to a 16-year-old girl.  After she became intoxicated, he had sex with her.  He was not found guilty of any other offense in that case.[3]

---

[3] A jury acquitted Tutrow of the lead charge of rape.  On June 20, 2018, the victim in the case obtained a non-expiring protection order against Tutrow barring him from engaging in any communication with her.  On June 20, 2019, the victim obtained a protection order that barred Tutrow from threatening a member of her household, ordered him to stay away from her residence and place of employment, and restrained him from contacting her.  The 2019 protection order expired on June 20, 2021.  PSR at 10.

The PSR indicates that Tutrow has complied with all Court-ordered conditions of pretrial release.  PSR at 3.

Based on his entire history—including at least one instance of revoked probation—Tutrow is a poor candidate for a probationary sentence.  This factor strongly favors a sentence of incarceration.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the Capitol building and grounds, and all that it involved, was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases arising out of the riot on January 6, 2021, including misdemeanor cases.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-00238 (TFH), Tr. 8/4/2021 at 3 (As Judge Hogan noted, "As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually – should be expected.")  This factor also weighs in favor of incarceration for a defendant like Tutrow, who has a troubling criminal history, entered the Capitol despite seeing evidence of a riot, possessed a weapon inside the Capitol, and was neither completely candid nor truthful—including stating while smiling he "didn't know I was trespassing" at the Capitol—during his FBI interview.

---

[4] FBI Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at: https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf.

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing in *United States v. Paul Hodgkins*, 21-cr-00188 (RDM):

> [D]emocracy requires the cooperation of the governed.  When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification.  It is a damage that will persist in this country for decades.

Tr. 7/19/2021 at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy.  It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 21-cr-00041 (CJN), Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of

13

government into disarray, and it undermines the stability of our society.  Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence.  This was not a protest.  *See Hodgkins*, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.").  And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

There is also a strong need for specific deterrence here.  In 2015, he received his first adjudication of guilt for a juvenile offense.  In less than five years since 2016, Tutrow has accumulated adult criminal convictions for six separate offenses, had one term of probation revoked, and appears to have spent at least 294 days in custody for these offenses.  He entered the Capitol despite seeing an ongoing riot, possessed a weapon inside the building and lied about it to the FBI, and minimized his conduct and made other misrepresentations during his interview with the FBI.  All this behavior demonstrates a pressing need for his sentence to specifically deter him from committing future crime.

Both the need to deter generally and to deter Tutrow specifically strongly favor incarceration in this case.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault

on law-enforcement officers, to conspiracy to corruptly interfere with Congress.[5]   Each offender

must be sentenced based on his or his individual circumstances, but with the backdrop of January

6 in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct

meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor

defendants will generally fall on the lesser end of that spectrum, but misdemeanor breaches of the

Capitol on January 6, 2021, were not minor crimes.   A probationary sentence should not

necessarily become the default.[6]

Indeed, this Court has admonished that it did not "want to create the impression that

probation is the automatic outcome here because it's not going to be." *United States v. Anna

Morgan-Lloyd*, 21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*,

21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't

want to create the impression that probation is the automatic outcome here, because it's not going

to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge

Friedman).

Tutrow has pleaded guilty to Count Four of the Information, charging him with parading,

demonstrating, and picketing in a Capitol building, a violation of 40 U.S.C. § 5104(e)(2)(G). This

offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and

infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply,

---

[5] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[6] Early in the Capitol-riot investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 21-cr-00164 (RCL); *United States v. Valerie Ehrke*, 21-cr-00097 (PFF); and *United States v. Donna Sue Bissey*, 21-cr-00165 (TSC).  The government is abiding by its prior agreement to recommend probation in these cases. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9ᵗʰ Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).  The government made no such agreement in this case.

U.S.S.G. § 1B1.9.  But the sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply.

For one thing, although all the other defendants discussed below and in the attached table participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long the defendant remained inside, the nature of any statements the defendant made (on social media or otherwise), whether the defendant destroyed evidence of participation in the breach, *etc.*—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1364-65 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id*.; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders

similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").  Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on codefendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of the legislative branch of the federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law-enforcement officials, and a large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol-breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increases and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent.  The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police, prompt acceptance of responsibility, and expressions of genuine remorse.

Here, to avoid unwarranted sentencing disparities, the Court should also consider the sentences imposed on other individuals with significant criminal histories who committed the same offense of parading, demonstrating, or picketing in a Capitol building.

In *United States v. Michael Curzio,* 21-cr-00041 (CJN), Curzio had a prior conviction for attempted murder, which involved him shooting the new boyfriend of his ex-girlfriend in the chest. He served over five years in prison for that offense, and was released less than two years before he committed his misdemeanor offense at the Capitol.  During two detention hearings in the Capitol case, the Court found there was evidence that Curzio had been a member of a white-supremacist prison gang while he served time for the attempted murder.

While Curzio's prior offense was a crime of violence and more serious than any of Tutrow's prior  offenses of conviction, Tutrow has a more extensive criminal history, albeit for misdemeanor offenses.  Had the sentencing guidelines applied to both defendants, Tutrow would have seven points (criminal-history category of IV) as opposed to three points that would presumably apply for Curzio (criminal-history category of II).[7]

Like Tutrow, there was no evidence that Curzio personally engaged in violent or destructive conduct at the Capitol, though Curzio made a statement on social media before he entered that he might get "[expletive] up" in Washington and wore a gasmask inside the building. He was arrested without incident inside the Capitol after spending a few minutes in the Capitol Visitor Center.  Unlike Tutrow, the Court did not find that Curzio brought a weapon inside the building.  Considering all these factors, the Court imposed the maximum sentence of six months of incarceration for Curzio.[8]

In *United States v. Karl Dresch,* 21-cr-00071 (ABJ), Dresch posted on social media before entering the Capitol, "NO EXCUSES! NO RETREAT! NO SURRENDER! TAKE THE

---

[7] A presentence report was not prepared in Curzio's case, so the presumptive calculation is based on his one prior conviction for a sentence of imprisonment exceeding one year and one month.  U.S.S.G. § 4A1.1(a).

[8] Curzio was detained for nearly six months for his offense, so this sentence amounted to a time-served sentence plus two additional days in jail.

STREETS! TAKE BACK OUR COUNTRY! 1/6/2021=7/4/1776." He also posted other statements to his Facebook account reflecting preparations to travel to Washington, D.C., for that purpose. After entering, he posted, "We are in," along with some images from inside the building. Dresch left after spending approximately 25 minutes inside without personally engaging in violence or destruction. He also made multiple boastful statements about his breach later, including, "we the people took back our house, . . . now those traitors Know who's really in charge." Unlike Tutrow, there was no evidence he brought a weapon into the Capitol.

Dresch had prior convictions for fleeing and eluding arrest after a high-speed car chase (2013), obstructing an officer (2011), permitting another to violate the motor vehicle code (2010), and disturbing the peace (2008). Had the guidelines applied to his Capitol offense, he would have had five criminal-history points and a criminal-history category of III, both lower than what the applicable scoring for Tutrow would be. The Court sentenced Dresch to the statutory maximum of six months, which amounted to a time-served sentence because he had been detained for over six months.

In *United States v. Mark Simon,* 21-cr-00067 (ABJ), Simon had 10 prior criminal convictions over the past 30 years, including one drug-trafficking felony, a firearms-related misdemeanor, and a vehicular assault, and at least five revocations of probation. He enthusiastically entered the Capitol at the Rotunda Doors, the site of one of the most violent breaches of the Capitol on January 6. Once inside the Capitol, Simon recorded boastful statements on his cellphone about his breach, and one of his videos was posted on social media. Simon expressed remorse in an interview with the FBI on August 5, 2021, shortly before he pleaded guilty.

The requested sentence of 60 days for Tutrow—less than what Curzio and Dresch received—is consistent with those sentences. Tutrow was acquitted of a prior charge for a violent offense, so his convictions were less serious than those other defendants' convictions, yet his recent criminal history is more extensive. Arguably, Tutrow's conduct was more aggravating because he brought a knife into the Capitol and lied to the FBI about that, but the other defendants engaged in conduct such as wearing a gasmask and social-media promotion that did not occur here. Tutrow wore a body-armor vest to the Capitol, though he claimed—and it appeared—not to contain armor plates in it. Further, Tutrow's cooperation with law enforcement, though significantly flawed, was somewhat more mitigating.

In addition, the sentencing recommendation for Tutrow is consistent with the 35-day sentence this Court imposed for Simon. Undoubtedly, Simon's criminal history—10 convictions, with a felony and some more serious offenses than Tutrow's, and five revocations of probation—is more serious than Tutrow's. Tutrow's six adult convictions are all misdemeanors, though the case involving contributing to the delinquency of a minor involved disturbing conduct, and he has only one revocation of probation so far. However, Simon's convictions and revocations are spread out over 30 years, while Tutrow—who is 23 years old while Simon is 50—has amassed his convictions and revocation in less than five years, and was adjudicated guilty in a juvenile matter in 2016.

Arguably, the circumstances of Simon's breach are more aggravating in one respect because he entered after witnessing the violent siege at the Rotunda Doors. Tutrow admitted he entered after observing tear gas outside the Capitol and hearing another individual's account that he wrestled a police officer, but the evidence is not as definitive that he witnessed violent

Case 1:21-cr-00310-ABJ   Document 43   Filed 12/13/21   Page 21 of 23

confrontations.  In addition, Simon boasted of his breach in cellphone videos, one of which was posted to social media, while there is no such evidence in Tutrow's case.

Nevertheless, Tutrow deserves a 60-day sentence due to highly aggravating factors not present in Simon's case.  Tutrow brought a knife into the Capitol—in itself problematic—and lied three times when the FBI asked if he had brought a weapon inside the building.  By contrast, there was no evidence Simon brought a weapon inside the Capitol, let alone lied about it to the FBI.  At multiple points, Tutrow made material statements about Wagner's conduct that he later completely recanted.  Finally, Tutrow expressed no remorse in his interview for breaching the Capitol.  Rather, he told the FBI he did not believe he had done anything wrong when he entered the Capitol.  By contrast, Simon expressed remorse in his interview with the FBI on August 5, 2021, shortly before he pleaded guilty.[9]

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "'only one of several factors that must be weighted and balanced,'" and the degree of weight is "'firmly committed to the discretion of the sentencing judge.'"  *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012) (quoting *United States v. Fernandez*, 443 F.3d 19, 32 (2d Cir. 2006)).  The

---

[9] Besides the other defendants discussed in this memorandum, additional defendants with significant criminal histories who also pleaded guilty to parading, demonstrating, or picketing under 40 U.S.C. § 5104(e)(2)(G) have received sentences of incarceration:

- In *United States v. John Lolos*, 21-cr-00243 (APM), the defendant (who had a prior adjudication of guilt for criminal harassment for threatening to kill a woman (2010)) was sentenced to 14 days of incarceration;
- In *United States v. David Mish*, 21-cr-00112 (CJN), the defendant (convictions for sex with a child 16 or older (misdemeanor), child abuse – intentionally causing harm, possession with intent to distribute THC (less than 500 grams), and bail jumping (all from 1998), plus several more recent traffic offenses) was sentenced to 30 days;
- In *United States v. Edward Hemenway*, 21-cr-00049 (TSC), the defendant (serious criminal history dating back to 2004, most notably, conviction for sexual battery and criminal confinement (2006) for which he was sentenced to three years in prison (all but one year suspended), and for which his probation was revoked and he was later resentenced to five years in prison) was sentenced to 45 days; and
- In *United States v. Robert Bauer*, 21-cr-00049 (TSC), the defendant (one driving-under-the-influence conviction (1999) and multiple drug-related offenses (2005-06) including one felony for which he was sentenced to three years in prison) was sentenced to 45 days.

§ 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

After a review of the applicable § 3553(a) factors, the government believes that a 60-day term of incarceration and the agreed-upon $500 restitution is appropriate here.

## V.   <u>Conclusion</u>

Sentencing here requires that the Court carefully balance the various factors set forth in 18 U.S.C. § 3553(a).  As detailed above, the factors support a sentence of incarceration.  Balancing these factors, the government recommends that this Court sentence Tutrow to 60 days of incarceration and $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing a significant term of incarceration as a consequence of his behavior, while recognizing his cooperation, though significantly flawed, and early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:   */s/ Seth Adam Meinero*
SETH ADAM MEINERO
Trial Attorney (Detailee)
D.C. Bar No. 976587
United States Attorney's Office for the
 District of Columbia
202-252-5847
Seth.Meinero@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 13, 2021, I served a copy of the foregoing on all

parties to this matter as listed in the Court's Electronic Case Files system.

*/s/ Seth Adam Meinero*
SETH ADAM MEINERO
Trial Attorney (Detailee)